## Petition of SOUTHERN BELL TEL. & TEL. CO.

Docket No. 72700-TP. Order No. 5815.

Florida Public Service Commission.

August 2, 1973.

Walter H. Alford, Miami, and Nathan H. Wilson, Jacksonville, for the petitioner.

Robert L. Shevin, Attorney General, and W. Robert Olive, Jr., Tallahassee, for the state intervenor.

Jack M. Skelding, Jr., of Madigan, Parker, Gatlin, Truett & Swedmark, Tallahassee, for Florida Hotel and Motel Association, intervenor.

Steven Wisotsky and Robert F. Williams both of Miami, for Legal Services of Greater Miami, Inc., intervenor.

Alan R. Lupka, Coral Gables, for Telephone Answering Service, intervenor.

Donald R. Alexander and Harry D. Boswell for the commission staff and the public generally.

Prentice P. Pruitt, Tallahassee, for the public generally.

Chairman WILLIAM H. BEVIS and Commissioners WILLIAM T. MAYO and PAULA F. HAWKINS participated in the disposition of this matter.

BY THE COMMISSION.

By application in this docket, Southern Bell Telephone and Telegraph Company (hereinafter referred to as the company) seeks to increase its rates and charges on an interim basis in the amount of $32,795,000. In conjunction therewith, it also proposes that its rates and charges be further adjusted so as to produce $70.3 million in additional annual gross revenues. The latter proposal has been assigned Docket No. 72701-TP and is the subject of extensive public hearings, the conclusion of which will be held within the near future. The interim application can be described as a "make-whole" application, that is, to bring the company's earnings back up to the authorized level of earnings, as prescribed in its last general revenue case,[1] while the permanent application (Docket No. 72701-TP) is designed to give the company an opportunity to earn 9.50% on its investment for the 12 months ending September 30, 1973.

The application for interim rate relief was filed pursuant to §364 05, Florida Statutes, and public hearings were held in Orlando in January, 1973, at which time testimony and exhibits in support of the application were presented. Subsequently, we entered Order No. 5686 on March 30, 1973, wherein we denied the application on the grounds that the company had not demonstrated that it was confronted with an emergency situation which would require the imposition of the rates on an interim basis.

Thereafter, an appeal was taken to the Supreme Court of Florida by the company challenging the correctness of Order No. 5686, supra.

### The court decision

In its opinion rendered on June 6, 1973,[2] the Supreme Court quashed Order No. 5686, supra, and remanded the cause to this commission for further proceedings not inconsistent with its decision. Southern Bell Telephone and Telegraph Company v. Bevis, et al, 279 So.2d 285 (Fla. 1973).

Basically, the court offered this commission two alternatives which would comport with its mandate. First, the court noted that

---

1. See Docket No. 71308-TP, where the company was authorized to earn 8.25% on its investment.

2. Rehearing was denied on July 24, 1973.

the commission made no findings of fact as to whether or not the company had proved its allegations as to revenue requirements and rate of return for the 12 months ending September 30, 1972. We had, instead, relied upon the lack of an emergency situation, and chosen to defer our decision on any rate relief until hearings on the permanent rate increase application had been completed. Thus, it is apparent that the commission is reposed with the discretion to deny this, or another like application, if the applicant's allegations can be shown to be incorrect, and sufficient findings of fact upon which we base our decision are set forth in detail. On the other hand, the court specifically stated that if the company herein has proved the allegations which were made in its petition for an interim rate increase, this commission *must* approve the request "so as to bring the Southern Bell rates within the statutory guidelines". (§364.03(1), F.S.). With the proceeding in this posture, this order is now rendered in order to comply with the mandate of the Supreme Court.

### Financial position of the company

In its petition, the company has pointed out that the fair and reasonable rate of return for the company was last established by this commission on January 4, 1972, in Docket No. 71308-TP. The range of reasonableness, in which that return lies, in turn was prescribed by this commission in March, 1970, when the company's last general revenue case was concluded.[3] By this application, it seeks merely to become "whole" again, and alleges that $32.8 million in additional revenues is necessary in order to bring its earnings up to the last prescribed fair rate of return.

The company contends, and the record so demonstrates, that for the twelve months ending September 30, 1972, which is the test period upon which the relief is predicated, its rate of return had declined to 6.78%, which is far below the minimum last established by this commission. Simple mathematics show that by increasing annual gross revenues by $32.8 million, its earned rate of return will be raised to 8.25%. This does not, however, take into consideration the increased payments to independent telephone companies which would be required as a result of the company's rate of return increasing. Thus, because of these additional revenue requirements which are inextricably related to the company's rate of return, the company will not achieve the 8.25% rate of return, which would make it "whole". Then, too, the record amply demonstrates the company's increasing cost of capital since its present rate of return was last established. For example, long term debt interest has increased from 4.79% in December, 1969, to 5.71%

---

3. See Order No. 4853, dated March 30, 1970, in Docket No. 69357-TP.

in December, 1970, to 6.01% in December, 1971, and stood at 6.16% at the end of 1972. Moreover, a decline in the embedded cost of debt is not likely in the immediate future since new long-term debt remains above the embedded cost as of the end of 1972. Thus, it is clear that the cost of capital for the company is now higher and we foresee no cessation in this trend. Our conclusion, then, is that any revenue relief designed to bring the company's earnings back up to 8.25%, which return was based on the company's cost of capital for the 12 months ending June 30, 1969, [4] cannot be viewed as excessive in light of the company's present cost of capital, the requirement that a portion of the revenues be paid to the independent companies, and its present earned rate of return, as reflected in the record. Therefore, the commission finds and so orders that the increase must be granted so as to meet the requirements of the law and comport with the mandate of the Supreme Court.

### Refund requirement

In its opinion, supra, the Supreme Court commented on the commission's authority to make any interim increase subject to refund at page 286 —

"If the commission feels that there is doubt about the propriety of the rate of return due Southern Bell and that the doubt might be resolved against the company in a full hearing and investigation attendant to the company's petition for permanent rate increases, the commission is fully empowered to make the rate increase contingent upon the outcome of the full hearing, and to require the company to repay any part of the interim increase to its customers which the commission may, at a later date, determine was improper."

In the preceding portion of this order, we have discussed the financial condition of the company for the twelve months ending September 30, 1972. There, we noted that company's rate of return at that time was only 6.78%, and that its cost of capital has been steadily rising since 1969. When coupled with the requirement that a portion of the $32.8 million be paid to independent companies, there can be little doubt, if any at all, that the $32.8 million in additional revenues will not make the company "whole". Under these circumstances, there would be no necessity for a refund feature, since there is little likelihood that the additional revenues, and its present rate of return, could be determined to be "exces-

4. See Footnote 3, supra.

sive". However, in an abundance of caution, and with the protection of the customers of the company foremost in our minds, this increase will be contingent upon the outcome of public hearings in Docket No. 72701-TP now scheduled to commence on August 14, 1973. Should any part of the interim increase be determined to be improper, the company shall be required to repay said portion to its customers.

## *Tariff revisions*

In its application, the company has proposed various increases in certain schedules which will generate the revenue requirements. Basically, the company has proposed to increase residence and business service connection charges from $15 and $21, respectively, to $38 and $45, respectively. In addition, it proposes to establish a new $10 charge for installing a residence extension with other work being performed on the premises. These, coupled with certain other comparable changes in other service connection charges and move and change charges, would generate approximately $23.63 million of the total revenue requirements. The company then proposes to increase the inward trunk differential from 1.25 times the B-1 rate to 1.50 times, and the outward trunk differential from 1.50 times the B-1 rate to 1.75 times. It also proposes to increase the rotary differential from the present B-1 rate to 1.2 times the B-1 rate. These changes, together with Centrex trunk differential changes, would generate approximately $6.27 million in additional revenues. It next proposes that residence extensions be increased from $1.10 per month to $1.25 per month. This latter change would generate approximately $1.28 million in additional revenues. Finally, the company proposes certain revisions in semi-public telephones charges, tie line mileage charges, and miscellaneous equipment charges. With respect to semi-public telephone service, the company presently prices the service on a daily guarantee basis, which equates essentially to an individual business line rate. It now proposes to charge a flat rate per month, which is equivalent to one-half the individual business line rate. Thus, daily guarantees will be eliminated, and the subscriber will now be billed a flat rate each month regardless of the useage and concomitant collections which may be made on the semi-public telephone. The company also proposes to increase the minimum intraexchange tie line mileage charge from $2.50 to $4.80. Finally, the proposed revisions on miscellaneous equipment involve increases on Trimline and Princess telephone instruments, extension bells, and instruments provided under the company's residence service package. These revisions, in the aggregate, would generate the remainder of the $32.795 million being authorized herein.

We have reviewed, at some length, the proposals made by the company. In our judgment, certain revisions in the company's original proposal should be made, as discussed hereinafter.

First, residence service connection charges should be increased from $15 to $30, in lieu of the proposed $38 charge. Business service connection charges, on the other hand, should be increased from $21 to $41. These revisions will place a greater portion of the costs associated with initially providing telephone service upon those customers who are responsible for their occurrence. A reasonable charge for a residence extension installation, in connection with other work being performed on the premises, is $7.50 rather than the $10 being proposed by the company. These increased charges, coupled with other changes proposed by the company for service connection charges and move and change charges, as partially modified in view of our revisions described hereinabove, will generate approximately $19.0 million of the additional revenue.

Next, we are hereby requiring the company to increase its inward trunk differential from the present 1.25 to 1.75 times the B-1 rate and the two way trunk differential from 1.50 to 2.00 times the B-1 rate. The rotary differential should be increased from the present B-1 rate (1.0) to 1.3 times the B-1 rate. These higher level charges more adequately reflect the useage differentials, as shown on useage studies submitted by the company. In addition, residence extensions should, in our opinion, be increased from $1.10 per month to $1.30 per month.

Finally, in view of the changes being required hereinabove, it will be necessary for the company to make certain other minor adjustments in its proposed revisions in order to produce the additional revenues authorized herein. The other changes proposed by the company are reasonable and proper, and they should be approved. Accordingly, the company is hereby directed to submit revised tariffs not inconsistent with our discussion herein.

Now, therefore, in consideration thereof, it is ordered that each and all of the specific findings herein be and the same are hereby approved in every respect.

It is further ordered that the petition of Southern Bell Telephone and Telegraph Company to increase its rates and charges on an interim basis so as to produce $32,795,000 in additional annual gross revenues be and the same is hereby granted and it is hereby authorized to revise its rates and charges so as to increase annual gross revenues by the amount of $32,795,000 based upon the operating results for the twelve months ending September 30, 1972.

It is further ordered that Southern Bell Telephone and Telegraph Company file with this commission, for its approval, appropriate tariff revisions consistent with our findings herein, said revisions to become effective not sooner than August 13, 1973.

It is further ordered that the increase granted herein shall be subject to refund to the customers of the company in the event this commission determines said increase, or any portion thereof, to be excessive after full hearings are held and completed in Docket No. 72701-TP.

It is further ordered that this increase is subject to any change in policy of the Cost of Living Council which may affect the present exemption of public utilities from price controls now authorized by §150.56 of Part 150, CFR.

By order of Chairman WILLIAM H. BEVIS, Commissioner WILLIAM T. MAYO and Commissioner PAULA F. HAWKINS, as and constituting the Florida Public Service Commission, this 2nd day of August, 1973.

*William B. DeMilly*
Administrative Secretary